Mr. Levine, are you ready to proceed? Good morning. May it please the Court, Bradley Levine on behalf of the appellant. We are cognizant of the fact that the large majority of decisions across the country, both in the circuit courts and district courts, have found that there is not, when there have been claims under property insurance policies, that there is no coverage for claims arising from COVID-19 contamination. And largely, those decisions have been grounded on the precept that we don't have physical loss or physical damage. And that is because there's not been any kind of structural alteration of the premises, of the actual structure itself, or that there hasn't been any kind of deprivation or destruction of property. And certainly, this Court's determination in the Goodwill Industries case is reflective of that. This case, however, has to be decided according to Colorado law. And Colorado law is different. And the reason the Colorado law is different is because we have the Western Fire decision that was decided in 1968. In that case, the Colorado Supreme Court found that there was physical loss. And it was interpreting the same provision, which is in the policy, which is at issue in this case, has to do with direct physical loss. And what the court found in that case is that because of the intrusion of the accumulation of these gas bins and the various accumulation and the fact that it saturated the building and so on, what the court determined is that because of that, what you had was a dangerous condition, one that rendered the premises, what the court said was that it was uninhabitable. What it said is, is that the premises were dangerous, it was unsafe, and as a consequence, what you had was physical loss. And that's exactly what we have under these circumstances. What we have is a complaint. The complaint alleges, and of course, this case was decided under Rule 12b-5, so we're looking at just simply what the allegations in the complaint are. What we have is a complaint that alleges that you have a virus. And that virus is no different than the gas fumes that were at issue in the Western Fire case. Well, it's quite a bit different, really, isn't it? I mean, first of all, the losses here were caused by local government's decision to restrict access to certain facilities, including your restaurant. And, you know, maybe the science was a little unclear at the beginning of the pandemic, but it wasn't too long into this that, as I recall those awful two years, that, you know, you're not going to get the virus from touching things. It's more of an airborne problem. And so the problem is not your physical premises. It's the fact that there are people in there that are sick and breathing. You know, so your gasoline fumes, I mean, that's basically something that made the premises dangerously inhabitable. And I see your attempt at the analogy, but isn't there kind of a crucial difference between the virus and the fumes? And under your logic, could a, you know, say there's been a flu outbreak or whooping cough, and the government closes a, you know, a shop or building or a restaurant, would that also be covered by the direct physical loss clause? And let me respond, Judge Timothy, on a couple of points. Number one is we had the exact same thing happen in the Western Fire case in the sense that you alluded to the fact that there was a shutdown of the premises. And, of course, that's what we know. We had all these executive orders that were issued by Governor Polis and by the Department of Health with respect to the various, you know, certainly up in Aspen and all over the state because of the pandemic. You had exactly the same thing happen in the Western Fire case. I mean, in other words, what you had was a shutdown of the premises by the Littleton Fire Department because of the fact that you had this accumulation of the gas fumes. And until that was resolved, people weren't going to be able to get into those premises. So you had exactly the same circumstance. As to what you were talking about as far as— By the way, just for clarification. Sure. It's more than just the gas fumes, right? It was gasoline itself. Sure. They talk about the gasoline itself, but the bottom line is that you're talking about—and, of course, what that denotes is that you've got physical loss, okay? In other words, because there are a lot of different circumstances, and we can talk about the whooping cough in a minute here. But the point is, though, is that—and, again, if you look at the complaint, and, again, that's all we're dealing with is the complaint that was filed in this case. You talk about the nature of this virus, and this virus is one which doesn't just—isn't just in the air. What we have is that at the time that this was filed, we were talking about what the science was known at that time. And that is that these—is that the droplets of the virus can be—stick on surfaces, and it can stay there as long as 28 days. So it's not just simply a matter of whether or not you have the COVID-19 is just in the air in general. That's why I see, you know, we have wipes, sanitary wipes. That's why we were wiping things down when we went into restaurants. Well, I asked you about the gasoline because— Sure. Didn't the church in Western Fire recover for the cost of property repairs? Yes, that's what—at least that's what they talk about, is $22,000 in property. Not loss of use, right. And that—but they talked about, you know, maybe in terms of how they measured whatever kind of loss. But at the same time, what the opinion says and what it describes is a loss of use. Well, it says $21,404.83, which represented the cost of remedying the infiltration and contamination problem. Sure. Because there's a difference, Your Honor, which is that, you know, such as Listeria, which is a restaurant. Well, you talked about briefly in your complaint repairs, but I don't see any linkage between that and any contamination. What repairs were done to your restaurant that were based on COVID? Well, first of all, as you say, it was simply, you know, as you say, we have to accept what is stated in the complaint. Well, you need to allege some facts to support that, though. Sure. And all you've got is a very brief reference to repairs. Sure. And there's nothing that you've alleged that links it to COVID. Sure. So where is the physical damage here that you're seeking recovery for connected to COVID? Your Honor, let me just—let me respond in two different ways. Yeah, I'd like you to reference the complaint, though. Sure. Okay? What we have is that the large aspect of the losses, which doesn't apply to a church building, is because of loss of business. Well, that's right. That's why I asked you in Western Fire. It wasn't loss of business. It was actually remedying the gasoline contamination at the building. That's a difference, isn't it, between this case and that case? Your Honor, because a church isn't going to suffer a loss of business in the same way that a restaurant is going to suffer loss of business. Yeah, but we're talking about the coverage of policy. Correct. And in Western Fire, it covered repairs to the church, and you're asking for recovery for loss of use, correct? Correct, because— And why isn't that a meaningful distinction between your case and Western Fire? Because in our policy, what we have is we've got different aspects of this policy. It does provide for the cost of repairs, but it also has—there's an entire section that deals with business interruption losses, and that's what we have. We've lost what we've alleged is $40,000, at least $40,000 a month, in lost business as a direct result of the loss of use of these premises, of this restaurant premises. So if you're talking about—and very frankly, we—I mean, the complaint doesn't have a claim per se. I can advise the court that what we're talking about is, just like any other restaurants during this period of time, that there had to be changes, structural changes to the walls. You had to have, you know, different tables were moved to different places and so on. But that's not the brunt of the damages that are being alleged in our complaint. It has to do with business interruption losses that, again, you're not going to have—a church is not going to incur those kinds of losses. So it's really not—I mean, now you're looking at the damages, and that is not going to tell you whether or not you have a direct physical loss, which is what the issue was, is whether or not you had it because of the lack of the ability to be able to use those premises, because of the fact that you had this—you had these fumes that were present in Western Fire. We've got this physical—even though it's not visible to the eye, we've got this physical virus that is present, was present, at this restaurant in Listeria. And that's the reason, in conjunction with the shutdown, that they had to shut down. So, you know, from our perspective, it's exactly the same kinds of circumstances. And the Western Fire case is really not alone. And it's really important. In the Goodwill Industries case— But for Western Fire, is this case Goodwill Industries? Well, I— We didn't have that precedent. Well, that's exactly right. I mean, here's the problem, Your Honor, is that Goodwill Industries was decided under Oklahoma law, and there wasn't a Western Fire. And if we—and again, if we get back, is that I can tell you that there were some things that, you know, from a factual standpoint, the Goodwill Industries was somewhat different. Apparently, all they did is they just simply shut their doors because of the requirements from the Oklahoma governor and so on. But they didn't—there weren't allegations of the kinds of losses, if you will. They just simply shut their doors and then reopened them when they were allowed to be able to do it. This was different in the sense that it really had this profound effect on the business of my client. For a month and a half, they were completely shut down. Even when they opened up, they were only able to open 25 to 50 percent of the time. But to your point, Your Honor, yes, that is the distinction. And that's what we would urge, is that because we're looking at Colorado law, that we have to look at what Western Fire says. There's one way that Goodwill does seem to be controlling, though, and that is with respect to the language on period of restoration in the contract. From what we said in Goodwill, why doesn't that bar your claim here? There are two reasons, Your Honor. One is that when you're talking about the period of restoration, what the court did is use that period of restoration to basically sort of support the conclusion that it reached. But when you're talking about— It supported it because it said it was right. Right. I don't think it was a qualified saying, this gives you a little support. I think it said this is an— Correct, correct. But let me just—so there are a couple other aspects to it. One is that when you're talking about period of restoration, that's not an insuring provision. What that does is it basically tells you to demarcate the amount of damages, the timing of how much damages you're going to be able to recover for business interruption. Second is that there are three different alternatives as far as the period of restoration. And two of those don't depend upon whether or not there's been any kind of repair or alteration. And third, it gets back to the point that I was making before, which is that we've got an allegation that, in fact, there was repair and alteration of our premises. So we had those things going on. And so that really is a distinction between what was held in Goodwill Industries and what we have in this case. The first two of the three seem to be that you're saying what we said in Goodwill was wrong. The third is a distinction. But as Judge Matheson was questioning you about, your allegation is pretty flimsy. It's—you need something more specific about that. But, Your Honor, again, this is simply—this is notice pleading. I mean, we filed this complaint and, you know, we indicated that there had been. And, again, that—it's not a question in terms of an insuring provision. In other words, that period of restoration is not going to alter or change what it is that was decided in Western Fire as far as whether or not you have physical—that you have direct physical loss, which is what the determination was in Western Fire. And, again, that period of restoration, for the reasons I've said, isn't going to change—it's not an insuring provision. Again, it just simply demarcates the amount of time, the amount of damages that you're going to be able to recover. So I'm not—there's nothing—I'm not saying there's anything wrong with the decision that was under Oklahoma law in the Goodwill Industries case. The point here is that what we have is this determination in the Western Fire case. And, you know, one of the things I would urge—and I'm just out of time here—is that, you know, if there's questions, you know, this is not the only case from Colorado. We've got—we present—we've got two other cases that are in the state district courts. We have the Monarch case. What's the status of the Boulder County case? Yeah, so the Boulder County case right now is that they have got some motion practice. They are just entering into expert discovery. And as far as the Spectrum Retirement Homes case, that's set for trial in October of 2023. So those cases— And where's Monarch? The Monarch case is—it was supposed to be heard in the January term. It just got—because one of the counsel was not able to be present, it's going to be put over. I assume it's going to be heard in the March term. Thank you, counsel. Thank you. I'm sorry I mispronounced your name. Mr. Litchfield? I hope I got that right. You did, Your Honor. And I was pleased to learn last night that there is a Litchfield, Nebraska, of which my family apparently has no connection, but it's nice to know that they spelled it correctly. If the court please, my name is Daniel Litchfield, and I'm one of the attorneys representing the Appley, the Cincinnati insurance company. I think this has already come out to a degree. This is a commercial property insurance policy that we have at issue here. It insures against physical loss or damage to property. That's the core element of the policy. So classically that would be a fire or windstorm and other types of obvious physical loss or damage to property. The business income coverage, which is the main thing that we're talking about in the briefing and here today, but there are other coverages like civil authority that are at issue and extra expense. All of them are adjuncts to this commercial property insurance policy. They're adjunct coverages after you get past the initial coverage that is supplied. This is not profits coverage, lost profits coverage. This is not coverage for the losses from government regulations. Let me back up to that issue of property. Perhaps this is something we now know was scientifically inaccurate, but at the time of the closures, at the restrictions, wasn't the theory that there was contamination of the business premises by the virus and that was dangerous to people? And wouldn't that be property damage under Western fire? I'll go at that question from several directions. First of all, back to the time. This was a relatively early complaint. We go with the allegations in this complaint. They are that the virus was ubiquitous. It was everywhere, so it must have been on our premises. They are that we had a former employee who tested positive. Don't say when. Don't say if he was ever on the premises when he was positive. The allegations are we found some customers who tested positive. Again, no tie to the property from that allegation. Speaking generally and looking at what was done and particularly looking at the orders which provide a clue to this, because these are contemporaneous orders from the state government in 2020, these orders say themselves that they are focused on social distancing because even at that point in time, the government recognized this is a person-to-person issue, that as was famously said in the very first case in this entire genre, the social life case from the Southern District of New York, that judge famously said this virus attacks lungs, not printing presses. So is your point that they have inadequately alleged that there was virus on the property, or is your point that the closure was not based on having clean surfaces, it was based on the inability to have social distancing in such an establishment? Maybe you're saying both. Yeah, certainly the first. There's no allegation here of presence. We have conclusory allegations of ubiquitous viruses being everywhere. Secondly, in terms of what the government did in its orders, I think those orders reflect the focus was on person-to-person communication of the virus. It was on keeping people in their homes so they weren't congregating, limiting the number of people who could be in a space, not having dining rooms at restaurants. But yet at the same time, the word in the government order, I think this was Public Health Order 2022, is encouraged. Restaurants are encouraged to stay open, the government said at that time. And that encouragement was so that they could supply food to the citizenry through carry-out and take-home. And the order broadly allowed for full access to the restaurant by the employees, by the managers, by the owners, in order to prepare that food. That's important from several perspectives. That fact is important. It's important because it buttresses the understanding that what we're dealing here with something that's fundamentally a person-to-person conveyance. And even if the conveyance is, for sake of argument, let's say going from my mouth to this podium, and then somebody touches the correct part of the podium. By the way, we're talking about a CoV-2 particle that's about 60,000 times smaller than a strand of hair, I've been told. If they touch that right part and somehow get it to themselves, that's still from a person to a person with this intermediate surface. That could have been cleaned, by the way. We know from the CDC, and this is on the record. Well, Counselor, could we just get back to the complaint? Yes. It does allege that the plaintiff undertook, and I'm quoting, some repairs and alterations on the premises. Now, if we draw inferences in favor of the plaintiff on a 12B6, why wouldn't it be reasonable to take that as alleging that because of COVID, the restaurant had to make some structural alterations in the restaurant? And why wouldn't that line up with Western Fire? Well, a couple of reasons. I'll want to get into Western Fire deeply in a minute, but the first simple direct answer to your question is those allegations are, frankly, insufficient under Twombly and Iqbal. They're using the compulsory word, there were repairs. We don't have anything indicating that these repairs were directly related to the presence of a virus on the premises, which itself is not directly alleged, beyond saying it's generally everywhere, so it must have been there. And what we're dealing with then is this incredible lack of appropriate and mandated detail to state a claim factually. I think this is what Iqbal and Twombly are really getting at, is you can't just say there was direct physical loss or damage to my property, so I get to move on in the case, right? No, you've got to plead facts. You can't just say, oh, we did repairs. There's got to be some detail, factual detail, brought in there that shows that these repairs, by the way, are somehow related to the absent factual allegations of presence of the virus on the premises to begin with. Back to Western Fire. A couple of comments about that I think are appropriate. Western Fire is in no way inconsistent with the broad development of the case law since that social life decision in the Southern District of New York in May of 2020. It recognizes that the loss of use alone, without being tethered to some physical loss, direct physical loss was the policy language there. It recognizes that the loss of use alone is insufficient to have coverage. That's at page 55. It does not find any ambiguity in that language. It finds that there was actual physical alteration of the structure. These allegations are recounted and the evidence about them recounted at pages Does it say alteration of the structure? No. That was certainly my argument. Well, the district court used that phrase, too, and I was going to ask you about that because I couldn't find that in Western Fire. Well, here's where you find it. You find it at page 55, and in particular, the allegation that there was physical loss to the structure from infiltration and contamination of the foundation, walls, and rooms. Foundation, walls, and rooms. A similar phrase occurs back on page 54 where the word is halls, H-A-L-L-S. The court might have intended to say walls. Either way, we're talking about infiltration and contamination of the physical structure of the church. That's what's different from here. Here we've got at most allegations that germs can come out of my mouth, and it doesn't have to be COVID-2 particles, any germs, cold, flu, and can come to rest on a surface, and that that might cause somebody to become contaminated. But that can be cleaned off the surface. We know from the CDC. And you can use common household cleaners, such as we can go to any superstore and purchase. And the CDC gives us a list of those. And it would be appropriate, I would hope, in any restaurant that you would wipe off tables, wipe off the bar, wipe off touch points. It's just part of having a clean, hygienic place to serve food to the public. And we know from a variety of cases that that element of cleaning essentially destroys the idea that these particles coming out of my mouth cause direct physical loss or damage to this podium. That's the undistributed middle in this attempted syllogism here, is getting it to direct physical loss or damage from just being the germs that come out of my mouth. I'm a fairly recent grandparent. I know personally now of all the germs that people can carry and pass on to other people. It's not just COVID-19. The concept is broader than that, that this somehow damages the property. The Mama Jo's case from the 11th Circuit under Florida laws is very instructive here because that didn't involve, that was pre-COVID, didn't involve the COVID-2 particles. It involved dust from road construction getting on the tables and chairs at an outdoor seating area. And they put in a claim for direct physical loss or damage-based coverage because they had to clean these tables. And the court said, well, this is my editorialism, nice try, but that's not sufficient under the pleading rules. You're just cleaning off the tables. My first real job in life was as a dishwasher at a steakhouse. And one of the things I had to do every night was mop the floor. I remember that time very well. It wasn't an easy job for me. Mopping the floor never occurred to me to be a repair of direct physical loss or damage to the floor. I was cleaning the floor. And that's essentially what we're dealing with here, with the COVID-2 particles, other germs that people can get onto surfaces that the CDC tells us, and there's really no dispute out there, that they can be cleaned readily with these various products that the CDC tells us about. And that's it. It's not a repair of damaged property. That's cleaning something. So back to Western Fire. Because it recognizes this infiltration and contamination of the foundation, walls, and rooms. And then there was $21,000 of repairs made to fix that problem. We're dealing with an entirely different situation factually than is alleged in the complaint here. And it doesn't matter that there was no Western Fire decision in Oklahoma, because it wouldn't have mattered for the Goodwill Industries decision. And Western Fire has been out there for 50 years. This overwhelming wave of authority that we have cited from all but one of the federal circuits, from 11 states' intermediate appellate courts, eight state supreme courts. We have some state district courts here in Colorado, though, that give it some life. I understand that. Judge, that's an accurate observation. I don't think those cases are well-reasoned. Should we send this up, ask the Colorado Supreme Court to weigh in? No. It's a major insurance law question, isn't it? You shouldn't ask the Colorado Supreme Court to weigh in for the following reasons. First of all, we're dealing fundamentally with the basic rules of insurance contract interpretation, which are well-settled in Colorado and have been for decades. We're just applying them to a different sort of a circumstance, comparing and contrasting, for instance, Western Fire with the facts that we have here. I get that, but that's the kind of thing that this court does for multiple states' laws, the biggest circuit I know of, all the time. It weighs in as a court sitting in diversity and determines what the law of the state is. It's an eerie determination in the absence of something that would be binding on you, and Western Fire is not in any way that would change the outcome of the district court's decision here. Why wait for the Colorado Supreme Court to weigh in on this? We just heard a report about the status of these cases. It sounds like quite a wait. Even if there was a certification, it would be quite a wait. It would be well within the ordinary course, I think, of this court's operations to just go ahead and decide this case and decide it now on its own authority, which is manifest, and let things proceed. That's what happened in Goodwill, where this court made the decision not to certify to the Oklahoma Supreme Court, which, by the way, then subsequently ruled in the Cherokee Nation case that you were right about Goodwill Industries. Cherokee Nation essentially followed Goodwill Industries. For all those reasons, I don't see a reasonable basis, a rational basis, or an appropriate basis to certify this to the Colorado Supreme Court, rather than just go ahead and decide, and we would assert decide by affirmance, of the district court's decision. It doesn't sound like there's any dispute that, in the absence of Western Fire, the decision in Goodwill Industries is determinative. I thought the question was provocative. If there was no Western Fire, would there be a different outcome? What's the difference? What we heard is an argument that Colorado law is different, but not that it's different because it doesn't apply the same basic rules of insurance contract construction. Principally, the plain and ordinary meaning rule, the rule on how you determine an ambiguity, and the rule that you look at words in context. You don't do what's done in so many of these briefs, which is to pull them out of context, go look at dictionary definitions. In this case, look at multiple different dictionaries. Do you find the definition that you like? Cherry pick those definitions, put it back together, and try to have it mean something other than what it clearly means in context. Every English word has more than one dictionary definition, with very few exceptions. That deconstruction approach just is a technique to avoid context. Here, it's a technique I would assert to avoid the role of the word physical in the phrase direct physical loss or damage to property. It's also very important to never forget the end of that phrase, to property. With that, I appreciate the time and attention. We ask this court to affirm the trial court's decision. Thank you very much. Thank you, counsel. Case is submitted.